IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| COMVERGE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:13-cv-00026-RWS |
| ENTEK SYSTEMS, LLC, and | ) | |
| ENTEK SYSTEMS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF COMVERGE, INC.'S
<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

A. Shane Nichols
  (Ga. Bar No. 542654)
Holly Hawkins Saporito
  (Ga. Bar No. 142496)
C. Suzanne Werner
  (Ga. Bar No. 321398)
Alston & Bird LLP
1201 West Peachtree Street
Atlanta, GA  30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email:  shane.nichols@alston.com
Email:  holly.saporito@alston.com
Email:  suzanne.werner@alston.com

**ATTORNEYS FOR PLAINTIFF
COMVERGE, INC.**

# TABLE OF CONTENTS

I.   INTRODUCTION ....................................................................................1

II.  BACKGROUND ......................................................................................2

    A.   The '225 Patent ..............................................................................2

    B.   The '639 Patent ..............................................................................2

    C.   The '700 Patent ..............................................................................3

III. APPLICABLE LAW ...............................................................................4

    A.   Principles of Claim Construction ..................................................4

    B.   The Importance of Intrinsic Evidence ...........................................5

    C.   The Role of Extrinsic Evidence .....................................................6

    D.   Construing Means-Plus-Function Limitations ..............................7

IV.  CLAIM TERMS AT ISSUE ....................................................................8

    A.   Disputed Terms from the '225 Patent ...........................................8

        1.   "Warning Signal" (Claims 1, 9, 13, 20, 24, 32)..................8

        2.   Means-Plus-Function Limitations.......................................10

            a.   "Monitoring Means" (Claims 1-3, 6-7).....................12

            b.   "Signal Means" (Claims 1, 9)....................................13

            c.   "Means for Sensing a Field" (Claim 3) .....................15

            d.   "Reset Means" (Claims 6-7).....................................16

            e.   "Means . . . for Activating a Visual Sensor" (Claim 10) ................................................................................18

            f.   "Data Collection Means" (Claims 11-12) ....................19

            g.   "Means for Altering Said First Period of Time" (Claim 8) ................................................................................20

    B.   Disputed Terms from the '639 Patent ...........................................21

        1.   "Fractional Run Time" (Claims 1, 13)...................................21

        2.   "Connected Load Value" (Claims 1, 13, 16)...........................22

        3.   "Allowed Energy Consumption Value" (Claim 1).................23

4. "Power Reduction Factor" (Claims 1, 11, 13) .......................... 24

C. Disputed Terms from the '700 Patent ................................. 25

1. "Electrical Load Data" (Claims 1-2, 9-10, 16) ...................... 25

2. "Electrical Load Control Data Packets" (Claims 2-4, 7-8, 16, 38, 55-57) ................................................................. 27

3. Means-Plus-Function Limitations ............................................ 29

    a. "Control Means" (Claims 1-3, 16-17) ........................... 30

    b. "First Monitoring Means" (Claims 1, 16) ..................... 31

    c. "Second Monitoring Means" (Claims 1, 16) ................. 33

    d. "Data Collection Means" (Claims 1-2, 9-11) ................ 34

    e. "Recording Means" (Claims 2, 16) ............................... 36

    f. "Communicating Means" (Claims 2, 7, 16, 38) ............ 38

    g. "Means for Transmitting [a Coded Command Signal]" (Claims 16, 38) ................................................. 39

    h. "Switching Means" (Claims 17, 38) .............................. 40

V. CONCLUSION ............................................................................... 41

# TABLE OF AUTHORITIES

**Cases**

*Apex Inc. v. Raritan Computer, Inc.*,
  325 F.3d 1364 (Fed. Cir. 2003) ...................................................................28

*Asyst Techs., Inc. v. Empak, Inc.*,
  268 F.3d 1364 (Fed. Cir. 2001) ...................................................................11

*B. Braun Med., Inc. v. Abbott Labs.*,
  124 F.3d 1419 (Fed. Cir. 1997) ....................................................................8

*Baden Sports, Inc. v. Wilson Sporting Goods Co.*,
  No. C11–603, 2012 WL 2514944 (W.D. Wash. Apr. 27, 2012) .................26

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*,
  262 F.3d 1258 (Fed. Cir. 2001) ...................................................................26

*Bennett Marine, Inc. v. Lenco Marine, Inc.*,
  No. 2012-1336, 2013 WL 5273116 (Fed. Cir. Sept. 19, 2013)....................11

*CBT Flint Partners, LLC v. Return Path, Inc.*,
  566 F. Supp. 2d 1363 (N.D. Ga. 2008)...........................................................4

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
  418 F.3d 1225 (Fed. Cir. 2005) ...............................................................9, 22

*Inverness Med. Switz. GmbH v. Warner Lambert Co.*,
  309 F.3d 1373 (Fed. Cir. 2002) .....................................................................6

*Kara Tech. Inc. v. Stamps.com Inc.*,
  582 F.3d 1341 (Fed. Cir. 2009) .....................................................................9

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*,
  324 F.3d 1308 (Fed. Cir. 2003) ...................................................................10

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) ................................................................. 4, 5, 6

*Merck & Co. v. Teva Pharm. USA, Inc.*,
  347 F.3d 1367 (Fed. Cir. 2003) ...................................................................22

*Micro Chem., Inc. v. Great Plains Chem. Co.*,
  194 F.3d 1250 (Fed. Cir. 1999) .................................................................7, 8

*Microsoft Corp. v. Multi–Tech Sys., Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004) ....................................................................4

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
    No. Civ. 00–1412, 2002 WL 1949755 (D. Minn. Aug. 16, 2002)...............28

*Nystrom v. TREX Co.*,
    424 F.3d 1136 (Fed. Cir. 2005) ....................................................................7

*OpenTV, Inc. v. Liberate Techs.*,
    No. C 02–00655, 2003 WL 25816918 (N.D. Cal. Dec. 2, 2003).................28

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...........................................................4, 5, 6

*Powell v. Home Depot USA, Inc.*,
    663 F.3d 1221 (Fed. Cir. 2011) ..................................................................24

*Seachange Int'l, Inc. v. C-Cor, Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005) ..................................................................23

*SunRace Roots Enter. Co. v. SRAM Corp.*,
    336 F.3d 1298 (Fed. Cir. 2003) ....................................................................6

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ....................................................................9

*Tex. Digital Sys., Inc. v. Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002) ....................................................................7

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
    529 F.3d 1364 (Fed. Cir. 2008) ..................................................................25

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ....................................................................26

**Statutes**

35 U.S.C. § 112 ..............................................................................................7, 10

**Other Authorities**

Microsoft Press Computer Dictionary 253 (1991) ...............................................28

## TABLE OF ABBREVIATIONS

The following abbreviations are used in this brief to refer to the materials identified in this table:

| ABBREVIATION | FULL TITLE |
|---|---|
| '225 Patent | U.S. Patent No. 5,345,225.  The '225 Patent is attached to this Brief as Exh. A |
| '639 Patent | U.S. Patent No. 7,606,639.  The '639 Patent is attached to this Brief as Exh. B |
| '700 Patent | U.S. Patent No. 5,576,700.  The '700 Patent is attached to this Brief as Exh. C |
| Patents-in-Suit | The '225, '639, and '700 Patents |

## TABLES OF PROPOSED CONSTRUCTIONS

The following tables set forth Comverge's proposed constructions for the disputed terms:

| U.S. Patent No. 5,345,225 | |
|---|---|
| **Terms or Phrases for Construction Proposed Jointly** | **Comverge's Proposed Construction** |
| "warning signal" (cls. 1, 9, 13, 20, 24, 32) | "a signal generated when the monitoring means detects that no current has been supplied to the load during a certain period of time." |
| "predetermined memory location" (cls. 9-11, 20-23, 32-34) | This term needs no construction and should be given its plain and ordinary meaning. |
| "predetermined state" (cls. 9-10, 20-21, 32-33) | This term needs no construction and should be given its plain and ordinary meaning. |
| "signal generator" (cls. 24, 32) | This term needs no construction and should be given its plain and ordinary meaning. |
| **Means + Function Terms** | |
| "monitoring means" (cls. 1-3, 6-7) | Function(s): "detecting whether a current is passing to a load by way of the load control device" <br><br> "continuously detecting whether a current is passing to a load by way of the load control device" <br><br> Structure: "Coupling monitor 66 or relay coil monitor 70" |
| "signal means" (cls. 1, 9) | Function: "generating a warning signal when no current is detected by the monitoring means for a first predetermined period of time" |

| | Structure: "LED 79" |
|---|---|
| "means for sensing a field" (cl. 3) | Function: "sensing a filed induced in the relay circuit when current is passing to the load from the load control device"<br><br>Structure: "relay coil monitor 70" |
| "reset means" (cls. 6-7) | Function: "restarting the predetermined period of time upon detecting of a current by the monitoring means"<br><br>"restarting the first predetermined period of time upon detecting of a current by the monitoring means continuously for a second predetermined period of time"<br><br>Structure: "microprocessor 75" |
| "means . . . for activating a visual indicator" (cl. 10) | Function: "activating a visual indicator"<br><br>Structure: "microprocessor 75" |
| "data collection means" (cls. 11-12) | Function: "reading the state of the predetermined memory location"<br><br>Structure: "optical reader 80" and "optical interface 82" |
| "means for altering said first period of time" (cl. 8) | Function: "altering the first period of time"<br><br>Structure: "command center 35" |

| U.S. Patent No. 7,606,639 ||
|---|---|
| **Terms or Phrases for Construction Proposed Jointly** | **Comverge's Proposed Construction** |
| "fractional run time" (cls. 1, 13) | "fraction of time during a particular time period that the appliance is calling for energy" |
| "connected load value" (cls. 1, 13, 16) | "quantity of an appliance's load upon connection (e.g., quantity, value, or rating in KW)." |
| "allowed energy consumption value" (cl. 1) | "((Fractional Run Time)*(Connected Load Value)) – Power Reduction Factor." |
| "power reduction factor" (cls. 1, 11, 13) | "amount of energy to be reduced during a given time period." |
| "calculating an allowed run time responsive to the allowed energy consumption" (cl. 1) | This term needs no construction and should be given its plain and ordinary meaning. |

| U.S. Patent No. 5,576,700 ||
|---|---|
| **Terms or Phrases for Construction Proposed Jointly** | **Comverge's Proposed Construction** |
| "electrical load data" (cls. 1-2, 9-10, 16) | "such information that comes from detecting the distribution and interruption of energy to an electrical load." |
| "electrical load control data packets" (cls. 2-4, 7-8, 16, 38, 55-57) | "units of information regarding the functioning of the control unit." |
| "data processing center" (cls. 1-2, 7-10, 16, 38, 55-57) | This term needs no construction and should be given its plain and ordinary meaning. |

| | |
|---|---|
| "electrical load control data" (cls. 1-2, 9-10, 55) | "information as to the functioning of the control unit, i.e., receipt of the control signal by the electrical load." |
| "effectiveness of said electrical load management system" (cls. 1, 8, 16, 55) | This term needs no construction and should be given its plain and ordinary meaning. |
| "timing data" (cls. 4, 6) | This term needs no construction and should be given its plain and ordinary meaning. |
| **Means + Function Terms** | |
| "control means" (cls. 1, 3, 16-17) | Function: "controlling the electrical load"  Structure: "control unit 32" |
| "first monitoring means" (cls. 1, 16) | Function: "generating electrical load data"  Structure: "first monitor 36" |
| "second monitoring means" (cls. 1, 16) | Function: "generating electrical load control data"  Structure: "second monitor 38" |
| "data collection means" (cls. 1-2, 9-11) | Function(s): "collecting the electrical load data and the electrical load control data"  "transmitting the electrical load data and the electrical load control data to a data processing center"  Structure: "data collection system 33" |
| "recording means" (cls. 2, 16) | Function: "recording the electrical load control data and the electrical load data during a plurality of predetermined |

| | |
|---|---|
| | time intervals" |
| | |
| | Structure: |
| | "recorder 90" |
| "communicating means" (cls. 2, 7, 16, 38) | Function: |
| | "transmitting the electrical load control data packets and the electrical load data packets to the data processing center" |
| | |
| | Structure: |
| | "communicating unit 96" |
| "means for transmitting" (cls. 2, 16, 38) | Function: |
| | "transmitting coded command signals" |
| | |
| | Structure: |
| | "command center 26" |
| "switching means" (cls. 17, 38) | Function(s): |
| | "removing the electrical load from the electrical distribution network" |
| | |
| | "inserting the electrical load in the electrical distribution network" |
| | |
| | Structure: |
| | "control relay circuit 62" |

# I.   INTRODUCTION

The claims terms in the '225, '639, and '700 Patents are self-explanatory and, in most instances, do not require construction.  Comverge proposes that a reasonable number of terms should be construed – 8 terms from the '225 Patent, 3 terms from the '639 Patent, and 11 terms from the '700 Patent.  EnTek has also identified these 22 terms for construction, and pursuant to the Court's Order granting Comverge's Emergency Motion to Limit Claim Terms (D.E. 55), the parties agreed to an additional eight terms for construction (D.E. 60).

For each of these terms, Comverge proposes constructions that are consistent with the intrinsic record.  In contrast, in its proposed constructions for the disputed terms, EnTek either ignores Federal Circuit guidance in construing claims, or improperly imports limitations from the specification in an effort to generate non-infringement positions.

As set forth below, Comverge has provided its proposed construction for all of the disputed terms that Comverge asserts should not be given their plain and ordinary meaning.  Comverge's proposed constructions are fully-supported by the case law, the intrinsic record and relevant extrinsic evidence, and, in most instances, the plain and ordinary meaning of the claim terms to a person of

1

ordinary skill in the art.  For these reasons, Comverge respectfully requests that the Court adopt its proposed constructions.

## II.      BACKGROUND

The Patents-in-Suit relate to controlling and monitoring the electrical load in an electrical load management system (*e.g.*, an electrical utility).  Some of the unique features of each of the Patents-in-Suit are discussed below.

### A.      The '225 Patent

The '225 Patent provides a method and apparatus for monitoring the connection status of a load control device (Exh. A at Col. 2:51-53).  The load control device detects whether current is passing through it to a load, and generates a warning signal when no current is detected after a predetermined period of time (*id.* at Col. 2:53-56).  This warning signal may be used by utilities to determine whether load control devices are functioning properly (*id.* at Abstract).

### B.      The '639 Patent

The '639 Patent discloses a method and system for curtailing the energy consumption of an appliance, such as an air conditioning compressor or a heat pump (Exh. B at Abstract).  The patented system includes a control unit, which facilitates the delivery of an amount of energy less than what the appliance is calling for when necessary to meet energy consumption goals (*id.* at Col. 2:64-3:5).

2

Thus, the patented method and system permits an appliance to be operable only for a certain amount of time in order to reduce overall power consumption by a predetermined amount of time (*id.* at Abstract).

## C.   The '700 Patent

The '700 Patent provides a method and apparatus for controlling an electrical load in a load management system, monitoring load control operations, and monitoring the energy supplied to an electrical load (Exh. C at Abstract; Col. 3:41-45).  If desired, a command signal may be transmitted by a remotely-located command center to a control unit within the apparatus which has the effect of temporarily interrupting the distribution of electrical energy to the electrical load (*id.* at Col. 3:46-60).

The disclosed apparatus further includes a first monitor for generating electrical load data in response to the distribution or interruption of energy to the electrical load, and a second monitor for generating electrical load control data in response to control operations (*e.g.*, either removing electrical load from the electrical distribution network or inserting electrical load into the network) (*id.* at Col. 3:61-67).  A data collection system collects the electrical load data and the electrical load control data, and transmits that data to a data processing center

3

remotely located from the electrical load (*id.* at Col. 4:4-8). In this manner, the apparatus operates as a load control switch, and also operates as a monitoring system by detecting the distribution or interruption of energy supplied to a particular load under the control of the system (*id.* at Col. 4:9-14).

## III.      APPLICABLE LAW

### A.      Principles of Claim Construction

The scope and meaning of the asserted patent claims is a matter of law to be determined by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-79 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996). In construing an asserted claim, "the Court looks first to the intrinsic evidence," which consists of "the patent itself, the claim terms, the specification (or written description), and the patent prosecution history, if in evidence." *CBT Flint Partners, LLC v. Return Path, Inc.*, 566 F. Supp. 2d 1363, 1366 (N.D. Ga. 2008) (citing *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1346 (Fed. Cir. 2004)). Courts are also authorized to rely on extrinsic evidence, which "'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (quoting *Markman*, 52 F.3d at 980).

4

**B.    The Importance of Intrinsic Evidence**

"[T]he words of a claim are generally given their ordinary and customary meaning," that is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13 (internal quotations and citations omitted). With respect to the specification, it is axiomatic that claims must be read "'in view of the specification, of which they are a part.'" *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 978). Indeed, the specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (internal quotations and citation omitted); *Markman*, 52 F.3d at 979.

A patent specification may contain one or more recitations of preferred embodiments of the invention, which are intended to provide examples that teach and enable a person of ordinary skill in the art how to make or use the invention. *Phillips*, 415 F.3d at 1323. A preferred embodiment, however, is simply an illustration of one way to implement the invention; it does not define the metes and bounds of the claims. Thus, the Federal Circuit has repeatedly warned that a patent's claims should not be limited by the descriptions of one or more preferred

5

embodiments contained in the specification.  *See, e.g.*, *id.* at 1323; *SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1305 (Fed. Cir. 2003).

"In addition to consulting the specification, . . . a court 'should also consider the patent's prosecution history'" in reviewing the intrinsic record, as "the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980).  "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317 (citing *Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380-82 (Fed. Cir. 2002)).

## C.    The Role of Extrinsic Evidence

Although placing "less significan[ce]" on extrinsic evidence than intrinsic evidence in "determining the legally operative meaning of claim language," the Federal Circuit has held that extrinsic evidence such as dictionaries and treatises, and definitions contained in such sources, may inform claim construction so long as those definitions do not contradict any definition found in the intrinsic evidence. *Phillips*, 415 F.3d at 1317, 1322-23 (internal quotation and citation omitted).

6

Undue reliance on extrinsic evidence is discouraged, however, because it runs the risk of divorcing the meaning of the claims from the public records (the patent, including the claims and specification, as well as the prosecution history) on which they are based. *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005).

## D.    Construing Means-Plus-Function Limitations

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure. . . in support thereof, and such claim shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof." 35 U.S.C. § 112(f).[1]    When construing claims drafted with such so-called "means plus function" language, the Federal Circuit has made clear that courts must undertake a two-step process. "The first step in construing such a limitation is to identify the function of the means-plus-function limitation." *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1208 (Fed. Cir. 2002) (citing *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999)). "The next step is to identify the corresponding structure in the written description necessary to perform that function." *Tex. Digital, Inc.*, 308 F.3d at 1208 (citing *Micro Chem.,*

---

[1]   Formerly 35 U.S.C. § 112 ¶ 6.

*Inc.*, 194 F.3d at 1258).    "[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).

## IV.    CLAIM TERMS AT ISSUE

As set forth more fully below, the majority of the disputes between the parties over claim construction involve terms for which EnTek proposes unnecessary or needlessly complex constructions for straightforward terms and phrases contained in the Patents-in-Suit.

### A.    Disputed Terms from the '225 Patent

### 1.    "Warning Signal" (Claims 1, 9, 13, 20, 24, 32)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| "a signal generated when the monitoring means detects that no current has been supplied to the load during a certain period of time" | "signal generated when load is not connected for a predetermined period of time and directed to a data storage device where it sets a memory location to a predetermined state" |

The specification describes the term "warning signal" as a signal generated when no current is detected for a predetermined amount of time (*i.e.*, a certain amount of time) (Exh. A at Col. 2:43-56).  The parties' competing constructions are similar in this regard, but EnTek seeks to import a limitation from the

8

specification into the construction of this term by including in its construction a requirement that the claimed "warning signal" be "directed to a data storage device where it sets a memory location to a predetermined state" (D.E. 60-2 at 4). However, the specification makes clear that this limitation relates *only* to a preferred embodiment, and is not a requirement for the term (Exh. A at Col. 2:61-63) ("The warning signal is *preferably* directed to a data storage device where it sets a memory location to a predetermined state.") (emphasis added).   EnTek's attempt to limit the construction of this term to a single preferred embodiment violates clear Federal Circuit authority, and should thus be rejected in favor of Comverge's proposed construction, which contains no such improper limitation. *E.g., CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005) ("In examining the specification for proper context, however, this court will not at any time import limitations from the specification into the claims.") (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002)); *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import limitations from the specification into the claims."); *Phillips*, 415 F.3d at 1323 (emphasizing that it is improper to import limitations

9

from a patent specification into claims, even if a patent only discloses a single embodiment).

### 2. Means-Plus-Function Limitations

The parties agree that several of the terms from the '225 Patent are means plus function limitations under 35 U.S.C. § 112(f). However, the parties dispute the proper procedure for construing such claims.

Indeed, while Comverge's proposed constructions follow the Federal Circuit's instruction for construing means plus function limitations – first identifying the function(s) of the means-plus-function limitation, then identifying the corresponding structure in the written description necessary to perform those functions, *Tex. Digital, Inc.*, 308 F.3d at 1208 – EnTek instead proposes constructions devoid of an identification of the functions and corresponding structures of the means-plus-function limitations. However, a construction of a means-plus-function limitation that does not contain either the disclosed functions or the corresponding structure cannot be correct. *See, e.g., Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003) ("Once a court establishes that a means-plus-function limitation is at issue, it must identify and construe that limitation, thereby determining what the claimed function is, and

what structures disclosed in the written description correspond to the 'means' for performing the function."); *Bennett Marine, Inc. v. Lenco Marine, Inc.*, No. 2012-1336, *et al.*, 2013 WL 5273116, at *4-5 (Fed. Cir. Sept. 19, 2013) ("In construing [a means-plus-function] limitation, a court must first identify the function recited and then identify the corresponding structure in the written description necessary to perform that function. . . . [T]he district court erred by failing to fully identify the function and corresponding structure required.") (citing *Asyst Techs., Inc. v. Empak, Inc.,* 268 F.3d 1364, 1369-70 (Fed. Cir. 2001)).  Thus, as discussed below, the Court should adopt Comverge's proposed constructions, which are proposed in accordance with clear Federal Circuit precedent and are fully supported by the specification, and reject EnTek's proposed constructions, none of which follow the Federal Circuit's instructions for construction means-plus-function limitations.

### a.   "Monitoring Means" (Claims 1-3, 6-7)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| Function(s):<br>"detecting whether a current is passing to a load by way of the load control device"<br><br>"continuously detecting whether a current is passing to a load by way of the load control device"<br><br>Structure:<br>"Coupling monitor 66 or relay coil monitor 70" | "a monitor circuit having a coupling current monitor that automatically measures whether current is flowing in a sensing conductor of a coupling loop of magnetic material or a relay coil monitor that automatically measures whether current is flowing in a coil of a load control relay." |

"The first step in construing [a means plus function] limitation is to identify the function of the means-plus-function limitation." *Tex. Digital Sys., Inc.*, 308 F.3d at 1208.  Here, the claims themselves set forth the functions of the claimed "monitoring means."  Claim 1 states that the "monitoring means . . . detect[s] whether a current is passing via said load control device to a load" (Exh. A at Col. 13:27-28).  Claim 2 further states that the "monitoring means continuously detects whether a current is passing via said load control device to said load" (*id.* at Col. 13:33-35).  In accordance with these express disclosures, Comverge proposes that the functions of the claimed "monitoring means" to be "detecting whether a current is passing to a load by way of the load control device" and "continuously detecting

12

whether a current is passing to a load by way of the load control device." *See Lockheed Martin Corp.*, 324 F.3d at 1319 ("The function of a means-plus-function claim must be construed to include the limitations contained in the claim language.").

With regard to the second step of construing means plus function terms – "identify[ing] the corresponding structure in the written description necessary to perform that function," *Tex. Digital, Inc.*, 308 F.3d at 1208 – the specification clearly links these functions to two structures identified as "current monitors": coupling monitor 66 or relay coil monitor 70 (Exh. A at Col. 12:63-67; 12:48-54; *see also id.* at Col. 12:17-24; Col. 5:30-34; Col. 5:41-Col. 6:4; Col. 7:14-17; Col. 9:3-7). Thus, Comverge's proposed construction is taken directly from the claims and specification, and should be adopted.

### b.   "Signal Means" (Claims 1, 9)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| Function:<br>"generating a warning signal when no current is detected by the monitoring means for a first predetermined period of time"<br><br>Structure:<br>"LED 79" | "a microprocessor having a counter therein that sets a tamper flag in its internal memory and a tamper flag in an external memory or data storage device connected to the microprocessor when the counter reaches a predetermined count." |

As previously stated, "[t]he first step in construing [a means plus function] limitation is to identify the function of the means-plus-function limitation." *Texas Digital Sys., Inc.*, 308 F.3d at 1208. Claim 1 of the '225 Patent expressly identifies the function of the claimed "signal means" as generating a warning signal when no current is detected by the monitoring means for a first predetermined period of time, as Comverge proposes (Exh. A at Col. 13:29-32) ("signal means responsive to said monitoring means for generating a warning signal when no current is detected by said monitoring means for a first predetermined period of time."). And the specification "identif[ies] the corresponding structure in the written description necessary to perform that function." *Tex. Digital, Inc.*, 308 F.3d at 1208. Specifically, the specification teaches that the LED 79 generates the warning signal described in claim 1 (Exh. A at Col. 12:5-16, 25-47). Thus, Comverge's proposed construction, which is taken directly from the patent claims and specification, is correct, and should be adopted.

14

### c.   "Means for Sensing a Field" (Claim 3)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| Function:<br>"sensing a field induced in the relay circuit when current is passing to the load from the load control device"<br><br>Structure:<br>"relay coil monitor 70" | "a coupling current monitor that automatically measures whether current is flowing in a sensing conductor of a coupling loop of magnetic material or a relay coil monitor that automatically measures whether current is flowing in a coil of a load control relay." |

Comverge's proposed function for the claimed "means for sensing a field" is taken straight from the claims. Specifically, claim 3 recites that the "monitoring means comprises means for sensing a field induced in said relay circuit when current is passing via said load control device to said load" (Exh. A at Col. 13:39-41). In accordance with this express disclosure, Comverge proposes the function of "means for sensing a field" to be "sensing a field induced in the relay circuit when current is passing to the load from the load control device." *See Lockheed Martin Corp.*, 324 F.3d at 1319 ("The function of a means-plus-function claim must be construed to include the limitations contained in the claim language.")

The specification discusses this function, and makes clear that the function is performed by relay coil monitor 70, as Comverge proposes (Exh. A at Col. 10:7-15 ("The current passing through the signal path provided by the closed relay 58

15

induces a measurable field within the relay coil because the large current load 30 draws a substantial amount of current from the network 22. By monitoring the relay coil, the relay coil monitor 70 supplies the microprocessor 75 with an indication of current detection when the monitor 70 detects a measurable current field in the relay 58.")).

### d.   "Reset Means" (Claims 6-7)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| Function:<br>"restarting the predetermined period of time upon detecting of a current by the monitoring means"<br><br>"restarting the first predetermined period of time upon detecting of a current by the monitoring means continuously for a second predetermined period of time"<br><br><br>Structure:<br>"microprocessor 75" | "microprocessor that resets an internal counter therein when a coupling current monitor detects the presence of a current for a minimum time." |

Claims 6 and 7 of the '225 Patent identify the function of the claimed "reset means." Claim 6 recites "reset means for restarting said predetermined period of time upon detection of a current by said monitoring means," and claim 7 recites "[t]he apparatus of claim 6, wherein said reset means is operable to restart said

16

first-recited predetermined period of time after detection of a current by said monitoring means continuously for a predetermined second period of time" (Exh. A at Col. 13:54-61).   Comverge's proposed construction of the functions for claimed reset means – "restarting the predetermined period of time upon detecting of a current by the monitoring means" and "restarting the first predetermined period of time upon detecting of a current by the monitoring means continuously for a second predetermined period of time" – is taken directly from those claims. *See Lockheed Martin Corp.*, 324 F.3d at 1319 ("The function of a means-plus-function claim must be construed to include the limitations contained in the claim language.").

Regarding the proposed structure, the specification identifies the "microprocessor 75" as controlling the tamper warning function of the disclosed load management device, which includes performance of the claimed "reset means" (Exh. A at Col. 12:17-50).   Thus, in accordance with the specification's teaching, Comverge proposes that the Court construe the "rest means" to be performed by "microprocessor 75."

### e.    "Means . . . for Activating a Visual Sensor" (Claim 10)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| Function:<br>"activating a visual indicator"<br><br>Structure:<br>"microprocessor 75" | "a microprocessor that causes a test LED located on the panel of the load control device to flash." |

Claim 10 is a dependent claim that recites "[t]he apparatus of claim 9, further comprising means responsive to said predetermined memory location's being in said predetermined state for activating a visual indicator positioned on said load control device" (Exh. A at Col. 14:3-6).  Comverge's proposed function for the "means . . . for activating a visual sensor" is taken directly from this claim, *i.e.*, "activating a visual indicator."  *See Lockheed Martin Corp.*, 324 F.3d at 1319 ("The function of a means-plus-function claim must be construed to include the limitations contained in the claim language.").  Moreover, the specification expressly discloses that this claimed means is performed by Comverge's proposed structure, "microprocessor 75." (Exh. A at Col. 6:5-17) ("When a 'no current' condition has lasted for a predetermined period of time for one of the monitored loads, this is taken as evidence of disconnection of the device 20 from the load. The microprocessor 75 then sets a tamper flag in its internal memory and also sets

18

a tamper flag in an external memory . . . .  When these memory flags are in a state

indicating detection of tampering, the microprocessor causes a test LED 79 on the

panel of the load management device 20 to flash.").

### f.    "Data Collection Means" (Claims 11-12)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| Function: <br> "reading the state of the predetermined memory location" <br><br> Structure: <br> "optical reader 80" and "optical interface 82" | "a remotely located data processing center and a communicating unit of the load control switching and monitoring apparatus operative to transmit to the data processing center, data stored at a pre-identified location in an internal memory of a microprocessor, external memory, or data storage device that is used to indicate the existence of a 'no current' condition." |

Comverge's proposed function for the claimed "data collection means" is

again taken straight from the claims.  Specifically, dependent claim 11 recites

"[t]he apparatus of claim 9, further comprising data collection means for reading

the state of said predetermined memory location" (Exh. A at Col. 14:7-9).  Thus,

Comverge proposes "reading the state of the predetermined memory location" as

the function for the claimed "data collection means."  For the proposed structure,

Comverge's construction – "optical reader 80" and "optical interface 82" – is again

taken from the specification, which describes that "the state of the memory

locations can be read by a technician with a conventional optical reader 80 via an optical interface 82" (*id.* at Col. 6:17-20).

g. **"Means for Altering Said First Period of Time" (Claim 8)**

| Comverge's Proposed Construction | EnTek's Proposed Construction |
| --- | --- |
| Function: "altering the first period of time"<br><br>Structure: "command center 35" | "a command center that sends a command to the load control device including a substituted first time period." |

As with its construction for the means-plus-function claim terms previously discussed, Comverge's proposed function for "means for altering said first period of time" is taken directly from the claims themselves. Claim 8 recites "[t]he apparatus of claim 7, further comprising means for altering said first period of time" (Exh. A at Col. 13:62-63). In accordance with this recital, Comverge proposes the function "altering the first period of time."

The specification teaches that "command center 35" performs the "means for altering said first period of time." Indeed, the specification states that "the predetermined period of time which must elapse prior to generating a warning signal when no current is detected, namely the first period of time, can be altered when the load management receiver 20 receives a command that includes a

20

substituted first time period from the command center 35" (*id.* at Col. 13:13-18).

Thus, as with its other constructions of the means-plus-function terms from the

'225 Patent, Comverge's proposed construction for "means for altering said first

period of time" is taken straight from the patent's claims and specification.

**B.    Disputed Terms from the '639 Patent**

**1.    "Fractional Run Time" (Claims 1, 13)**

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| "fraction of time during a particular time period that the appliance is calling for energy" | "a fraction of time during a predetermined period of time for which the connected appliance is running." |

The term "fractional run time" is mentioned only once in the specification

(Exh. B at Col. 3:14-23).  There, the inventors particularly define the term as the

fraction of time during a *particular* time period that the appliance is calling for

energy (Exh. B at Col. 3:19-23) ("By integrating over a *particular* time period,

such as one hour, when the appliance 14 is 'calling' for energy, the processor 50

obtains an accurate estimate of the fraction of time during the *particular* time

period that the appliance is running.") (emphasis added).  Comverge's proposed

construction is thus fully supported by the specification, while EnTek's proposed

construction – which replaces the patentee's chosen word "particular" with

"predetermined" and adds the modifier "connected" to appliance (which appears

21

nowhere in the relevant specification passage) – imports limitations into this claim

term in violation of well-established Federal Circuit precedent.  *E.g., CollegeNet,*

*Inc.*, 418 F.3d at 1231.

### 2.    "Connected Load Value" (Claims 1, 13, 16)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| "quantity of an appliance's load upon connection (e.g., quantity, value, or rating in KW)." | "the amount of energy consumed by an appliance connected to the system for reducing energy consumption when such appliance is operating." |

The term "connected load value" is used throughout the claims, and was

specifically described in the specification by the inventors as the "quantity of an

appliance's load upon connection" measured by, for example, "quantity, value, or

rating in KW" (Exh. B at Col. 3:24-37).  Comverge's proposed construction of the

term, which is taken directly from the specification, should thus be adopted.  *See*

*Merck & Co. v. Teva Pharm. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003)

("[C]laims must be construed so as to be consistent with the specification, of which

they are a part.").

### 3.    "Allowed Energy Consumption Value" (Claim 1)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| "((Fractional Run Time)*(Connected Load Value)) – Power Reduction Factor." | "an amount of time mathematically computer by a microprocessor of the system for reducing energy consumption that a connected appliance is permitted to run during a selected period of time, such amount being computed as: allowed energy consumption value divided by the connected load value of the connected appliance." |

The term "allowed energy consumption value" is the result of a mathematical computation specifically described in the specification of the '639 Patent (Exh. B at Col. 4:18-34).   Comverge's proposed construction simply restates the inventor's description in a mathematical formula instead of written text to simplify this term for the jury.   EnTek, on the other hand, proposes a lengthy and confusing construction replete with limitations not found in the intrinsic record.  *Seachange Int'l, Inc. v. C-Cor, Inc.*, 413 F.3d 1361, 1376 (Fed. Cir. 2005). Thus, Comverge's proposed construction, which is clear, entirely consistent with the specification, and contains no improper limitations, should be adopted, and EnTek's should be rejected.

### 4.    "Power Reduction Factor" (Claims 1, 11, 13)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| "amount of energy to be reduced during a given time period." | "a number of watts of energy consumption by a connected appliance, received by the system for reducing energy consumption from a remote source, that is to be curtailed during a time interval." |

Both the specification and the claims discuss the term "power reduction factor." And in both the specification and the claims, the inventors of the '639 Patent describe the "power reduction factor" as an amount of energy to be reduced during a given time period (*see, e.g.*, Exh. B at Col. 3:14-18 ("The system 10 implements load management by a reduction in energy, or the total kilowatt-hours called for within a given time frame. For example, the system 10 may curtail run time by a certain amount of energy called within a one-hour period."); *id.* at Col. 6:6-9 ("receiving a power reduction factor, the power reduction factor comprising a number of watts of consumption to be curtailed by the appliance during a predetermined period"); *see also id.* at Col. 7:5-9). Thus, Comverge's proposed construction of this term comports with the patent's specification and claims. *See, e.g., Powell v. Home Depot USA, Inc.*, 663 F.3d 1221, 1233 (Fed. Cir. 2011); *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1374 (Fed. Cir.

2008).   EnTek, on the other hand, proposes another lengthy construction that improperly imports limitations into the claims and would confuse the jury, and therefore Comverge's proposed construction should be adopted.

**C.    Disputed Terms from the '700 Patent**

    **1.    "Electrical Load Data" (Claims 1-2, 9-10, 16)**

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| "such information that comes from detecting the distribution and interruption of energy to an electrical load." | "data generated in response to the distribution or interruption of energy to the electrical load, where the data includes time and date data." |

The term "electrical load data" from the '700 Patent was recently construed by another court to mean "such information that comes from detecting the distribution and interruption of energy to an electrical load" (Exh. D at COM001195; COMV001199).  Comverge proposes that this Court adopt that same construction, which is fully supported by both the specification and the claims of the '700 Patent.

In discussing "electrical load data," the specification states that the first monitor generates such data "in response to the distribution or interruption of energy to the electrical load" (Exh. C at Col. 3:65-67); (*see also id.* at Col. 5:48-52; Col. 8:1-5).  This definition is echoed in the claims, as claim 1 recites "first

monitoring means for generating electrical load data in response to detecting the distribution and interruption of said energy to said electrical load" (*id.* at Col. 19:25-27). Thus, Comverge's proposed construction – which has already been adopted by the District of Connecticut – comes directly from the claims and specification, and should be adopted. *See, e.g., Merck & Co.*, 347 F.3d at 1371 ("A fundamental rule of claim construction is that terms in a patent document are construed with the meaning with which they are presented in the patent document."); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("'It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, [and] the specification . . . . Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.'")); *Baden Sports, Inc. v. Wilson Sporting Goods Co.*, No. C11–603, 2012 WL 2514944, at *3 (W.D. Wash. Apr. 27, 2012) (noting that although prior claim construction order is not binding, the court will "give[] ample consideration to the reasoning in the prior construction order").

2.     "Electrical Load Control Data Packets" (Claims 2-4, 7-8, 16, 38, 55-57)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| "units of information regarding the functioning of the control unit." | "data packets stored by the recorder regarding electrical load control data during predetermined time intervals which include timing data in the form of a date and time stamp indicating the relative time for the start of each of the predetermined time intervals." |

"Electrical load control data packets" is another term from the '700 Patent that was recently construed by another district court.   In that case, the Court construed the term to mean "units of information regarding the functioning of the control unit" (Exh. D. at COMV001199).   Comverge proposes that this Court adopt the same construction for the term, as that construction is fully supported by the specification of the '700 Patent.

The specification describes the data collection system's collection of electrical load control data and electrical load data as follows:

> The data collection system includes a recorder and a communicating unit. ***The recorder stores the electrical load control data*** and the electrical load data during predetermined time intervals ***to respectively produce stored electrical load control data packets*** and stored electrical load data packets. ***In this manner, the apparatus collects and stores information relating to the***

27

> **control operations conducted by the control unit** and the distribution or interruption of energy supplied to the electrical load prior to transmitting the information to the utility.

(Exh. C at Col. 4:63-Col. 5:5).  Thus, according to the specification, "electrical load control data" is information relating to the control operations conducted by the control unit – *i.e.*, information regarding the functioning of the control unit – and packets is a well-known term in the industry which means a unit of data. *Microsoft Corp. v. Multi-Tech Sys., Inc.*, No. Civ. 00–1412, 2002 WL 1949755, at *19 (D. Minn. Aug. 16, 2002) ("A packet is a unit of information transmitted as a whole from one device to another.") (citing Microsoft Press Computer Dictionary 253 (1991)); *see also Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1375-76 (Fed. Cir. 2003); *OpenTV, Inc. v. Liberate Techs.*, No. C 02–00655, 2003 WL 25816918, at *5 (N.D. Cal. Dec. 2, 2003).  In accordance with the teachings of the specification and this commonly-used industry term, the District of Connecticut construed "electrical load control data packets" to mean "units of information regarding the functioning of the control unit" (Exh. D. at COMV001199). Comverge requests that this Court also adopt this construction.

### 3.      Means-Plus-Function Limitations

The parties agree that several of the terms from the '700 Patent are means plus function limitations under 35 U.S.C. § 112(f).  However, as previously discussed (*see* Section III.D., *supra*), the parties dispute the proper procedure for construing such claims, with Comverge proposing constructions which first identify the function(s) of the means-plus-function limitation and then identify the corresponding structure in the written description necessary to perform those functions, *Texas Digital, Inc.*, 308 F.3d at 1208, and EnTek proposing constructions devoid of an identification of either the function(s) or structure(s) of the means terms at issue.  This Court should therefore reject EnTek's proposed constructions, none of which follow the Federal Circuit's instructions for construction means-plus-function limitations, and adopt Comverge's proposed constructions, which are taken directly from the '700 Patent's claims and specification.

### a.   "Control Means" (Claims 1-3, 16-17)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| Function:<br>"controlling the electrical load"<br><br>Structure:<br>"control unit 32" | "a control unit having (1) a load control receiver that receives coded command signals, including addressing data and command data, from a remote control center, and (2) a control relay circuit that (a) interrupts electrical energy supplied to a load in response to a first command signal and (b) restores electrical energy to the load by inserting the load into an electrical network in response to another command signal." |

As previously discussed, the Federal Circuit instructs that "[t]he first step in construing [a means plus function] limitation is to identify the function of the means-plus-function limitation." *Tex. Digital Sys., Inc.*, 308 F.3d at 1208.  With regard to "control means," claim 1 defines the function of that term.  Specifically, claim 1 states "control means for ***controlling said electrical load*** in said load electrical distribution network . . . ." (Exh. C at Col. 19:21-22).  In accordance with this express disclosure, Comverge proposes that the function of the claimed "control means" be construed as "controlling the electrical load."  *Lockheed Martin Corp.*, 324 F.3d at 1319 ("The function of a means-plus-function claim must be construed to include the limitations contained in the claim language.").

30

With regard to "identify[ing] the corresponding structure in the written description necessary to perform that function," *Texas Digital, Inc.*, 308 F.3d at 1208, the specification states that "control means" corresponds to "control unit 32" (Exh. C at Col. 7:47-51) ("The control unit 32, also described as a control means . . . ."); (*see also* Exh. C at Col. 3:52-56).  Thus, Comverge's proposed construction of "control means" is fully supported by the specification, and should be adopted.

### b. "First Monitoring Means" (Claims 1, 16)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| Function:<br>"generating electrical load data"<br><br>Structure:<br>"first monitor 36" | "a first monitor connected between the load and control unit, and having a current sensor circuit and a first signal generator that generates electrical load data (including date and time data) in response to detecting the distribution and interruption of energy supplied to the electrical load." |

Comverge's proposed construction for "first monitoring means" comports with the patent specification and the Federal Circuit's mandate for construing means plus function claim terms.  First, with regard to the proposed function, *Texas Digital Sys., Inc.*, 308 F.3d at 1208, claim 1 describes the function of the claimed "first monitor means" as that which Comverge proposes, *i.e.*, "generating electrical load data" (Exh. C at Col. 19:25-27) ("first monitoring means for

generating electrical load data in response to detecting the distribution and interruption of said energy to said electrical load;"); *see also* (*id.* at Col. 20:44-46). Next, Comverge's proposed structure for performing this function, "first monitor 36," is taken straight from the specification, which repeatedly describes "first monitor 36" as the component responsible for "generating electrical load data" (*see id.* at Col. 3:61-63 ("The apparatus further includes a first monitor, otherwise described as a first monitoring means, for generating electrical load data . . . ."); *id.* at Col. 8:1-5 ("The first monitor 36, connected between the electrical load 24, the control unit 32, and the data collection system 33, generates electrical load data in response to the distribution or interruption of energy supplied by the network 22 via the control unit 32 to the load 24.").  Therefore, Comverge has identified the correct function and structure for the claimed "first monitoring means."

32

c.     **"Second Monitoring Means" (Claims 1, 16)**

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| Function:<br>"generating electrical load control data"<br><br>Structure:<br>"second monitor 38" | "a second monitor connected between the control unit and a data collection system, having a relay position sensor circuit and a second signal generator, and generating electrical load control data (including date and time data) representing the operating state of the control unit in response to detecting operation of the control unit to remove or insert the load from/into electrical distribution network." |

Comverge's proposed construction for "second monitoring means" is also taken straight from the patent specification and claims.  Claim 1 states that "second monitoring means" is used for "generating electrical load control data" in the claimed system; the specification confirms that this is the proper function (*see* Exh. C at Col. 19:28-30 ("second monitoring means for generating electrical load control data in response to detecting the control operation of said control means;"); *id.* at Col. 8:11-15 ("The second monitor 38, connected between the control unit 32 and the data collection system 33, generates electrical load control data in response to the control unit 32 operating to control the electrical load 24 in the electrical distribution network 22."); *id.* at Col. 3:61-65 ("The apparatus further includes a

33

first monitor, otherwise described as a first monitoring means, for generating electrical load data and a second monitor, also referred to as a second monitoring means, for generating electrical load control data.")).  Moreover, the specification states that the "generating [of] electrical load control data" is accomplished by the "second monitor 38," in accordance with Comverge's proposed construction (*id.* at Col. 8:11-15; Col. 3:61-65).

### d.   "Data Collection Means" (Claims 1-2, 9-11)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| Function(s):<br>"collecting the electrical load data and the electrical load control data"<br><br>"transmitting the electrical load data and the electrical load control data to a data processing center"<br><br>Structure:<br>"data collection system 33" | "a data collection system, including a data recorder having first data storage for storing signals from the first signal generator to produce stored electrical load data packets and a second data storage for storing signals from the second signal generator to produce stored electrical load control data, and a communicating unit for receiving the stored electrical load data packets <u>and</u> electrical load control data packets from the recorder and transmitting the stored electrical load data packets <u>and</u> electrical load control data packets to the data processing center for processing to determine the effectiveness of the electrical load management system, where the electrical load data packets and electrical load control data packets each include date and time data." |

Comverge proposes that the claimed "data collection means" be construed as performing two functions, "collecting the electrical load data and the electrical load control data" and "transmitting the electrical load data and the electrical load control data to a data processing center."  Both proposed functions are taken directly from the claims, as mandated by the Federal Circuit.  *Lockheed Martin Corp.*, 324 F.3d at 1319 ("The function of a means-plus-function claim must be construed to include the limitations contained in the claim language.").  Specifically, claim 1 states that the claimed "data collection means [are] for collecting said electrical load data and said electrical load control data and communicating said electrical load data and said electrical load control data to said data processing center . . . ." (Exh. C at Col. 19:31-34).  Therefore, Comverge has proposed the correct functions for "data collection means."

Regarding the second step of construing means plus function claim terms, identifying the structure that performs the disclosed functions, the specification expressly identifies "data collection system 33" as  the structure corresponding to the claimed "data collection means" (*id.* at Col. 4:4-8 ("The apparatus also includes a data collection system, also described as a data collection means, for collecting the electrical load data and the electrical load control data, and

35

transmitting the data to a data processing center remotely located from the electrical load."); *id.* at Col. 8:17-20 ("The data collection system 33 accepts the electrical load data and the electrical load control data from the data interface 31 and transmits the data to the data processing center 28 via the communications link 30."). Therefore, "data collection system 33" is correctly identified as the structure for performing the disclosed "data collection means."

### e.    "Recording Means" (Claims 2, 16)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| Function:<br>"recording the electrical load control data and the electrical load data during a plurality of predetermined time intervals"<br><br>Structure:<br>"recorder 90" | "a data recorder having first data storage for storing signals during multiple predetermined time intervals to produce stored electrical load data packets and a second data storage for storing signals during multiple predetermined time intervals to produce stored electrical load control data packets, where the electrical load data packets include time and date data and the electrical load control data packets include time and date data." |

"Recording means" is included in two claims, both of which set forth "recording said electrical load control data and said electrical load data during a plurality of predetermined time intervals" as the function performed by this means (Exh. C at Col. 19:41-45; Col. 20:53-58).     Therefore, Comverge's proposed

function, "recording the electrical load control data and the electrical load data during a plurality of predetermined time intervals," is taken directly from the claims, and should be adopted.  *Lockheed Martin Corp.*, 324 F.3d at 1319.

Comverge proposes "recorder 90" and the structure for performing the disclosed function of the claimed "recording means."  As with its other proposed constructions of means plus function terms, Comverge took its proposed structure directly from the specification, which clearly identifies "recorder 90" as the disclosed structure for the "recording means" (Exh. C at Col. 11:45-49 ("The data collection system 33 includes a recorder 90 and a communicating unit 96. ***The recorder 90, otherwise referred to as a recording means***, stores each of the first signal, the second signal, the third signal, and the fourth signal.") (emphasis added)).  Thus, Comverge has also identified the correct structure for performing the claimed "recording means."

f.      "Communicating Means" (Claims 2, 7, 16, 38)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| Function:<br>"transmitting the electrical load control data packets and the electrical load data packets to the data processing center"<br><br>Structure:<br>"communicating unit 96" | "a communicating unit for transmitting stored electrical load data packets and electrical load control data packets to the data processing center, where the electrical load data packets include time and date data and the electrical load control data packets include time and date data." |

Comverge proposes that "transmitting the electrical load control data packets and the electrical load data packets to the data processing center" be adopted as the function for the claimed "communicating means," a construction taken directly from the patent specification and claims.   Specifically, this proposed function comports with the description of the function in all claims which recite "communication means," namely, claims 2, 7, 16, and 38 (*see* Exh. C at Col. 19:47-50; Col. 20:1-5; Col. 20:59-62; Col. 23:45-50; *see also id.* at Col. 5:24-27; Col. 12:5-9).   Regarding Comverge's proposed structure, "communicating unit 96," this was also taken directly from the specification, which identifies this component as performing the disclosed function (*e.g., id.* at Col. 12:5-9 ("The communicating unit 96 receives the stored data packets from the recorder 90 and transmits the stored electrical load data packets and the stored electrical load

38

control data packets to the data processing center 28 via the communications link 30.")).  Comverge has therefore identified the correct function and structure for this claim terms.

### g.   "Means for Transmitting [a Coded Command Signal]" (Claims 16, 38)

| Comverge's Proposed Construction | EnTek's Proposed Construction |
|---|---|
| Function:<br>"transmitting coded command signals"<br><br>Structure:<br>"command center 26" | "command center which initiates an electrical load control operation by transmitting coded command signals having addressing data and command data via a transmitting antenna to the load control switching and monitoring apparatus." |

Claims 16 and 38 recite the claimed "means for transmitting [a coded command signal]" in their preambles.  In both instances, the claims define the function of "means for transmitting" as "transmitting coded command signals," as proposed by Comverge (Exh. C at Col. 20:33-39; Col. 23:1-7).

The structure that "transmit[s the] coded command signals" is defined in the specification as "command center 26."  Specifically, the specification states that "the command center 26, otherwise referred to as a means for transmitting a coded command signal, initiates an electrical load control operation by transmitting coded command signals via the transmitting antenna 29 to the load control switching and

monitoring apparatus 20" (*id.* at Col. 9:17-21).   Thus, Comverge's proposed

structure for the claimed "means for transmitting [a coded command signal] was

explicitly defined in the specification as "command center 26."

      **h.**    **"Switching Means" (Claims 17, 38)**

| Comverge's Proposed Construction | EnTek's Proposed Construction |
| --- | --- |
| Function(s):<br>"removing the electrical load from the electrical distribution network"<br><br>"inserting the electrical load in the electrical distribution network"<br><br>Structure:<br>"control relay circuit 62" | "the control relay circuit of a control unit of a load control switching and monitoring apparatus which operates to remove an electrical load in response to a selected decoded command signal and operates to restore the electrical load in response to another selected decoded command signal." |

      Claims 17 and 38 recite "switching means," and these claims recite an

identical function for the claimed means, namely, "switching means for removing

said selected electrical load from said electrical distribution network in response to

a selected one of said decoded command signals and inserting said selected

electrical load within said electrical distribution network in response to another one

of said decoded command signals" (Exh. C at Col. 21:8-13; Col. 23:11-16).

Comverge's proposed functions, "removing the electrical load from the electrical

distribution network" and "inserting the electrical load in the electrical distribution

40

network," are thus taken directly from the specification.  *Lockheed Martin Corp.*, 324 F.3d at 1319.

"Switching means" is another term for which the structure is expressly defined by the specification.   Specifically, the specification states that "[t]he ***control relay circuit 62, otherwise described as a switching means***, operates to remove the electrical load 24 in response to a selected decoded command signal and operates to restore the electrical load 24 in response to another selected decoded command signal" (Exh. C at Col. 9:45-49) (emphasis added).   Therefore, the correct structure for the claimed "switching means" is, as Comverge proposes, "control relay circuit 62."

## V.   CONCLUSION

For all the reasons set forth above, Comverge respectfully requests this Court adopt its proposed constructions.


Respectfully submitted this 24th day of January, 2014.


Alston & Bird LLP

s/   Suzanne Werner
A. Shane Nichols
   (Ga. Bar No. 542654)

41

Holly Hawkins Saporito
  (Ga. Bar No. 142496)
C. Suzanne Werner
  (Ga. Bar No. 321398)
1201 West Peachtree Street
Atlanta, GA  30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email:  shane.nichols@alston.com
Email:  holly.saporito@alston.com
Email:  suzanne.werner@alston.com

**ATTORNEYS FOR PLAINTIFF
COMVERGE, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 24, 2014, I electronically filed the above document with the Clerk of Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

s/  Suzanne Werner

C. Suzanne Werner
  (Ga. Bar No. 321398)
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA  30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777
Email:  suzanne.werner@alston.com

**ATTORNEY FOR PLAINTIFF
COMVERGE, INC.**

43